**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**
**CASE NO.: 1:11-CV-00016-R**

**UNLIMITED MARINE, INC.**                                                                 **PLAINTIFF**

**v.**

**EMPIRE INDEMNITY INSUR. CO., et al.,**                                          **DEFENDANTS**

**MEMORANDUM OPINION**

     This matter comes before the Court on multiple motions by the parties.  Plaintiff

Unlimited Marine, Inc. ("UM") moves for permission to file an amended petition for a

declaration of rights.  Defendants Empire Indemnity Insurance Company and Zurich American

Insurance Company (collectively "Defendants") have responded in opposition and UM has

replied.  This motion is now ripe for adjudication.  For the reasons that follow, it is DENIED.

     UM has also moved for summary judgment, seeking a declaration of rights under an

insurance contract.  Defendants have responded and also moved for summary judgment.  The

parties have replied to each other's motions and they are now ripe for adjudication.[1]  For the

reasons that follow, Defendants' motion is GRANTED and Plaintiff's motion is DENIED.

Judgment is entered for Defendants.

**BACKGROUND**

---

[1] Defendants originally filed a motion for judgment on the pleadings pursuant to Federal
Rule of Civil Procedure 12(c) (DN 20).  During a telephonic conference, the Court informed the
parties that it would consider the disposition of this matter through Plaintiff's later-filed
dispositive briefing.  Accordingly, the Court will construe Defendants' motion for judgment on
the pleadings as a part of the instant briefing for summary judgment.

     In addition, there has been some confusion over the title of this dispositive motion.  The
Federal Rules of Civil Procedure do not contemplate a "Motion for Declaratory Judgment";
instead, the Court will construe all of these motions as seeking summary judgment in the
respective parties' favor.

The facts are not in dispute.  UM is a marine retail business in Russell County, Kentucky, that sells sporting and recreational water-craft.  In the winter of 2010, UM was approached by Vince Trotter of Auction Connection, LLC in Murfreesboro, Tennessee, to consign nine motorboats and one recreational vehicle for an auction in Murfreesboro.  The auction was with reserve, meaning UM submitted the inventory under the express agreement that Trotter would abide by preestablished minimum prices for each item.  The total combined reserve price for the inventory was $272,000.  The auction was held on February 18 and 19, 2010.  Without UM's knowledge, Trotter sold the motorboats and the vehicle for a total of $141,000, well below the agreed-upon reserve prices.

In the months following, UM made efforts to recover its inventory by initiating legal proceedings in Tennessee, Georgia, and Oklahoma against Trotter and several of the purchasers at the auction.  The process was complicated by the fact that a number of purchasers at the auction were themselves retailers of marine vehicles who quickly passed the items on to new, unsuspecting buyers.  Although legal action was initiated against the marine dealers, UM did not file lawsuits against the private purchasers.  UM has been relatively successful in recovering its property, as it has reclaimed six of the ten items it sent to the auction.  In addition, legal action continues in Tennessee circuit court to collect proceeds of Trotter's fraudulent sales.  The total recovery effort has not come cheap.  UM hired attorneys in Kentucky, Oklahoma, and Tennessee to engage in the far-flung search and recapture of its inventory.  It has accumulated roughly $116,682 in fees, with more to come depending on the duration of the case in Tennessee.

During and prior to these events, UM had insurance coverage with Defendants.  Policy, DN 25-2.  The Policy provided blanket coverage for all property losses by theft, including

2

"'Vessels' held as inventory for sale", for up to $1,000,000.  *Id*. at 100.  Theft losses are defined as "the unlawful taking of 'money', 'securities', real property or personal property to [the insured's] deprivation."  *Id*. at 73.  The Policy excludes theft by false pretenses, stating as follows:

> We will not pay for loss or damage caused by or resulting from any of . . . [v]oluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device, or false pretense.

*Id*. at 103-04.

Through an endorsement, UM purchased additional coverage for theft by false pretenses ("Endorsement").  DN 25-2 at 116.  Theft by false pretenses is defined as "[a] person causing you to voluntarily part with Covered property by trick, scheme, fraudulent device, or false pretense."  *Id*. at 116.  The annual aggregate limit of insurance for this additional coverage is $10,000.  The Endorsement itself contains a number of exclusions.  One of these exclusions voids payment unless the insured "make[s] every effort to recover the Covered Property when it is located" ("Every Effort Clause").  *Id*. at 117.

In June of 2010, Defendants paid UM the full $10,000 as provided for under the Endorsement.  UM returned the check, informed Defendants of the recovery efforts it had undertaken, and asked Defendants to recalculate the amount it was due.  Defendants resubmitted a payment on December 7, 2010, excluding any reimbursement for UM's expenses in attempting to recover its inventory.  UM again asked Defendants to determine if it was entitled to reimbursement for the efforts it made to recover the property, specifically attorneys' fees.  On December 30, 2010, Defendants decided that the policy did not cover these expenses and refused payment.

3

On January 3, 2011, UM filed a declaratory judgment action against Defendants under KRS § 418, *et. seq.*, in the circuit court of Russell County, Kentucky.  On January 28, Defendants removed it pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

## DISCUSSION

### I. Motion to file an amended petition

During this matter, UM and Defendants have operated under the assumption that their dispute revolved around the insurance coverage provided by the Endorsement.  The filings before this and other courts, as well as correspondences between the parties, are couched in the language of false pretense, having ignored the possibility of collecting under the Policy's theft provisions.  *E.g.*, DN 12-1; DN 25-3 at 16; DN 27-2 at 3; DN 27-3, ¶ 17.

UM has now filed a motion for leave to file an amended petition for a declaration of rights.  Upon further research, UM believes the adjuster working for Defendants incorrectly assumed the loss resulted from theft by deception.  It contends Trotter's scheme could instead be categorized as a "theft loss" under the Policy's properly-loss section.  UM advances that, depending on when Trotter conceptualized his intent to defraud, the loss of the merchandise could be covered under either the Endorsement as a "theft by false pretenses" or the Policy as a "theft."  Accordingly, it seeks to amend its petition and add the following language:

> On February 18 and 19, 2010, the Auction Connection LLC in Murfreesboro, Tennessee fraudulently induced Petitioner to consign nine boats, motors and trailers, on recreational vehicle, and a separate outboard motor for sale at auction on February 20, 2010 in Murfreesboro.  The auction company falsely represented that it would honor Petitioner's reserve (minimum) prices for each item being consigned and would not sell any item below its reserve price.  The total of all reserve prices established by Petitioner was $272,639.  *Pleading in the alternative, the representations were not false, and there was no fraudulent conduct or intent on February 18 and 19, 2010 by the Auction Connection LLC or its owner, Vince Trotter; and the theft did not occur until February 20, 2010.*

4

First Amended Petition, DN 24-1 ¶ 5 (emphasis added).

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave."  The rule directs that the "court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This rule gives effect to the principle that, as far as possible, cases should be determined on their merits and not on technicalities.  *Cooper v. Am. Employers' Ins. Co.*, 296 F.2d 303, 306 (6th Cir. 1961).  Denial of leave to amend may be appropriate "where there is undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc."  *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 690 (6th Cir. 2003) (citations and quotation omitted).

"'A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss.'"  *Riverview Health Inst. LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)).  For motions to dismiss, the court should decide if the pleadings contain "enough facts to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Where clear provisions of a contract preclude recovery by a litigant, courts routinely grant motions under Rule 12(b)(6).  *See e.g.*, *Brewer v. U.S. Fire Ins. Co.*, 446 F. App'x 506 (3d Cir. 2011) (dismissal of claim by employee was proper where the insurance policy excluded liability coverage for bodily injury to employees); *American Corporate Soc. v. Valley Forge Ins. Co.*, Civ. No. 09-5568, 2010 WL 2950367, at *3 (D.N.J. July 22, 2010) (where insurance policy excluded damage from governmental action, court dismissed plaintiff's breach

of contract claim when insurer denied coverage after police raid); *Skyview Film & Video, Inc. v. Safeco Life Ins. Co.*, 864 F. Supp. 755 (N.D. Ill. 1994) (suicide exclusion in insurance policy justified dismissal of plaintiff's suit to collect life insurance); *see also Cram v. Pepsico Executive Income Deferral Comp. Program*, No. 08-CV-10627, 2010 WL 4877275, at *9 (S.D.N.Y. Aug. 9, 2010) ("Where, as here, the dismissal is based on the plain language of a contract, amendment would be futile because the problem with Plaintiff's causes of action is substantive; better pleading will not cure it." (citation and quotation marks omitted)).

Nestled within the Policy is a list of general exclusions for coverage.  DN 20-4 at 12-21. The following exclusion can be found within:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
> . . .
> h. Dishonest or criminal acts by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or *anyone to whom you entrust the property for any purpose*:
>> (1) Acting alone or in collusion with others; or
>> (2) Whether or not occurring during the hours or employment.
> This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

DN 20-4 at 13-14 (emphasis added).  Defendants declare that the current motion to amend is futile because this exclusion precludes coverage under the Policy irrespective of when Trotter's subjective intent to defraud arose.

When evaluating insurance coverage in light of an exclusion, a court must strictly construe the exclusion against an insurer and not expand it beyond the "clear and unequivocal meaning."  *Kemper Nat. Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 873-74 (Ky. 2002).  Yet, the court cannot ignore the plain language of the contract.  *Id.*  "'[I]f any one

exclusion applies [then] there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions.'"   *Id*. at 874 (quoting *Weedo v. Stone–E–Brick, Inc.*, 405 A.2d 788, 795 (N.J. 1979)).

The facts of this matter implicate the above-stated exclusion.  The parties are in agreement that UM entrusted its merchandise to Trotter and that only through his dishonesty did a loss occur.  The exclusion does not delineate a time frame during which the actor must have conceptualized the dishonest or criminal act.  In fact, the text of the exclusion contemplates the exact opposite, denying coverage "whether or not occurring during the hours of employment." The three requirements for denial of coverage are a loss, resulting from a dishonest or criminal act, perpetrated by someone entrusted with covered property.  All are present in the current matter.  The language of the exclusion stubbornly resists UM's claims that Trotter's scheme could be covered as a theft under the Policy's terms.

UM cannot recover under the Policy and is limited to the terms of the Endorsement.  The offered amendment to the petition for a declaration of rights is futile.  The Court will therefore DENY the motion to amend under Federal Rule of Civil Procedure 15(a).

## II. Motions for summary judgment

In denying the motion to amend, the lone issue for the Court is the breadth of the false pretense coverage provided in the Endorsement.  UM contends that imbedded within the clause requiring it to "make every effort" to reclaim stolen property is the implicit obligation of Defendants to reimburse expenses incurred during the recovery effort.  This is strictly a question of contract interpretation.  UM does not to allege that Defendants or their employees made promises or representations that these expenses were covered either before the execution of the

7

agreement or after the loss was suffered.  The Court must determine whether the language of the Endorsement requires reimbursement or if some aspect of state law justifies the imposition of a term repaying UM for its labors.

### A. Standard for summary judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v.*

8

*Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

### B. Application of Kentucky law in a petition for declaratory judgment

The Declaratory Judgment Act permits "any court of the United States, upon the filing of an appropriate pleading, to declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A suit to enforce an insurance contract and to recover insurance benefits arises under state law. When the district court decides an issue of state law, it must first look to the state's supreme court for guidance. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 697 (6th Cir. 2006) (citing *Erie*, 304 U.S. at 78). In the absence of a relevant decision, the district court should predict the possible resolution of the issue by the state's highest court or look to the lower appellate courts in the state. *Aarti Hospitality, LLC v. City of Grove City, Ohio*, 350 F. App'x 1, 7-8 (6th Cir. 2009) (citations omitted).

### C. Analysis

UM contends the Every Effort Clause is ambiguous on two fronts. First, neither the Endorsement nor the Policy defines what "make every effort" entails. Second, it is unclear whether Defendants are obligated to repay UM for its attempts to comply with the clause. The Court discusses each below.

Under Kentucky law, "[w]here the terms of an insurance policy are clear and unambiguous, the policy will be enforced as written." *Kemper*, 82 S.W.3d at 873 (citations

omitted).  An otherwise clear contractual term may be ambiguous where reasonable people can assign different or inconsistent interpretations.  *Auto-Owners Ins. Co. v. Goode*, 294 S.W.3d 32, 36 (Ky. Ct. App. 2009) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)).  "[W]hen a contract is susceptible of two meanings, it will be construed strongest against the party who drafted and prepared it."  *Perry v. Perry*, 143 S.W.3d 632, 633 (Ky. Ct. App. 2004) (quoting *B. Perini & Sons, Inc. v. S. Ry. Co.*, 239 S.W.2d 964, 966 (Ky. 1951)).

Plainly stated, the Every Effort Clause's impact on compelling cooperation from the insured is unclear.  The Endorsement and Policy omit guidance on what constitutes "every effort," who determines if insureds have performed their duties under the provision, and how Defendants measure whether insureds meet the standard.  Kentucky law treats an insurer's use of vague terminology as if the contract included a latent ambiguity.  *Jones v. Bituminous Cas. Corp.*, 821 S.W.2d 798, 802 (Ky. 1991).  When ambiguous or vague terms appear in insurance policies, they are subject to the general rules of construction for adhesion contracts, whereby the court imposes rules of textual interpretation to glean what the parties intended and what type of coverage is justified.  *Id*. at 802-03; *see Old Republic Ins. Co. v. Underwriters Safety & Claims, Inc.*, 306 F. App'x 250, 254 (6th Cir. 2009) (applying Kentucky law).

UM employs much of its briefing to explain why the Every Effort Clause is ambiguous.  Defendants do not seriously contest this point.  The definition of "every effort" is entirely dependent on the specific circumstances of a false-pretense theft.  It is easy to picture a range of scenarios whereby insureds could satisfy the Endorsement's clause through minimal action, or conversely, take the numerous and complex steps UM did.  The Endorsement does a poor job of

establishing the parameters of the Every Effort Clause and guiding insureds on how they are suppose to abide by it.

Nevertheless, whether or not the Every Effort Clause is vague or subject to various interpretations will not bear on the Court's decision.  The Every Effort Clause operates as an exclusion to the false pretense coverage.  DN 25-2 at 116 ("In addition to the Exclusions of the Coverage Part . . . will not pay . . . unless you . . . make every effort . . . .").  Coverage was not rejected on the basis of this exclusion or under the Endorsement as a whole.  Rather, Defendants promptly paid the limit of insurance after UM reported the loss.  Since Defendants never denied coverage, they must have believed UM complied with the Endorsement and satisfied the Every Effort Clause.  The boundaries of the phrase are therefore immaterial to the real question - who is suppose to pay for UM making every effort to recover its merchandise?

The Endorsement does not condone or forbid the practice of paying the insured a sum for tracking down its own stolen property.  "When a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily compelled to resort to a consideration of the surrounding circumstances and the conduct of the participants indicating their interpretation."  *Dennis v. Watson*, 264 S.W.2d 858, 860 (Ky. 1953).  Still, the Kentucky Supreme Court has warned against "rewriting" policies to create coverage where none originally existed:

> The rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract.  Neither should a nonexistent ambiguity be utilized to resolve a policy against the company.  We consider that courts should not rewrite an insurance contract to enlarge the risk to the insurer.

*St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226-27 (Ky. 1994) (citing *U.S. Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir. 1988)).

UM contends the failure to examine an insurer's responsibility to reimburse any payments from an insured to recover stolen property constitutes a missing term in the Endorsement. It says that the ambiguity warrants the recovery of expenses incurred complying with the Every Effort Clause. Defendants do not directly respond to the missing-term allegation, focusing on the reasonableness of UM's belief that all legal fees, no matter the amount, were covered by the Endorsement.

The Court agrees that *some term* is missing from the Endorsement. It reaches this conclusion by conceptualizing a different scenario. Imagine a thief was able to swindle UM out of $6,000 of merchandise though a scheme that was covered under the Endorsement. UM could spend $150 in attorneys' fees to recover the property, but decides against it and instead files a claim with Defendants for the loss. One can envision an argument that UM failed to exercise "every effort" to recover the property, as spending $150 to recover $6,000 is a fair and reasonable use of capital. Assume now that UM did pay the attorney and was successful in recovering its inventory. The labors and finances of the insured have effectively saved the insurer from a $6,000 expenditure. It seems only equitable under these circumstances for the insured to be reimbursed for his efforts and payments.[2] However, under Defendants' interpretation of the Endorsement, no amount expended by the insured to reclaim lost property is covered because the Endorsement does not address the repayment of these costs.

Kentucky courts interpreting insurance contracts and questions of coverage often defer to

---

[2] This hypothetical ignores the existence of a deductible.

12

notions of equity or public policy to reach a solution.  *See e.g.*, *Chaffin v. Kentucky Farm Bureau Ins. Cos.*, 789 S.W.2d 754, 756-57 (Ky. 1990) (exclusion for stacking uninsured motorist coverage violated principles of equity and public policy); *National Life & Acc. Ins. Co. v. Ransdell*, 82 S.W.2d 820, 822 (Ky. 1935) (finding it would be "unjust and unfair" for the insurer to delay in asserting defense of waiver); *McMullin v. McMullin*, 338 S.W.3d 315, 323 (Ky. Ct. App. 2011) ("Public policy dictates that a wrongdoer should not be allowed to profit from his or her own wrongdoing."); *Hamilton Mut. Ins. Co. v. U.S. Fidelity & Guar. Co.*, 926 S.W.2d 466, 470 (Ky. Ct. App. 1996) ("simple sense of fairness" led the court to believe insurer was primarily liable for excess judgment).  Where an insured expends its own funds to recover stolen property covered by an insurance policy, thereby reducing the insurer's liability, equity and fairness should require reimbursement of at least some portion of those expenditures.

Precedent exists to support such an equitable remedy.  Couch on Insurance provides a lengthy explanation of the reciprocal common law duty for an insurer to repay an insured's mitigation efforts:

> The issue of recovery under a property insurance policy for the insured's own expenses in preventing, minimizing, or investigating a loss is generally determined in part by the terms of the policy, in part by application of historical common law principles of mitigation, and, potentially, by the terms of statutes of various types. While the very recitation of these factors indicates that true general principles are hard to come by, it is safe to say that the insured will generally be allowed to recover expense items that can be shown to have, or to have likely, inured to the insurer's own benefit by preventing or minimizing a loss for which the insurer would have been liable.  The rationale for this principle is virtually common sense: any other rule would provide the insured with the economic incentive to allow the loss to occur, to the detriment of the insurer, quite possibly the insured, and in a fair number of cases, to the general public, as well.
> . . .
> Reimbursement is available if labor was to prevent a covered loss.  Where the insured takes such steps, it is clearly for the benefit of the insurer thereby creating a duty to reimburse the insured.

13

12 A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 178:10 (3d ed. 2011) (available on Westlaw) (hereinafter "Couch on Insurance").[3]  Cases outside Kentucky have made rulings that reflect the spirit of this section in the treatise.  *See e.g.*, *Curtis O. Griess & Sons, Inc. v. Farm Bureau Ins. Co. of Nebraska*, 528 N.W.2d 329, 334 (Neb. 1995) ("Implicit in our decision rejecting the proposed instruction is the rule that expenses necessarily incurred in the course of mitigating damages are recoverable by an insured."); *Borton & Sons, Inc. v. Travelers Ins. Co.*, No. 18100-6-III, 2000 WL 60028, at *6 (Wash. Ct. App. Jan. 25, 2000) ("An insurer has a corresponding duty to compensate the insured for the reasonable expenses incurred in mitigating a loss, even if the expenses are not expressly covered under the policy.").  Kentucky courts have yet to consider this duty to reimburse an insured's costs.

Notwithstanding the concerns over equity and mitigation, the above-stated scenario is dissimilar from the instant matter in one important respect: UM spent ten times the Endorsement's limit of insurance to recover the stolen property.  The most Defendants ever could have paid for a legitimate claim of theft by false pretense is $10,000.  UM is unconcerned about this threshold on Defendants' liability.  Pl. Reply, DN 31 at 2 ("Since the policy set no ceiling on expenses, there is none.").  Were the Court to adopt this rationale, it would make no difference if UM spent ten times or a hundred times the Endorsement's coverage - any sum used to recover property by UM must be reimbursed regardless of whether the expenditures exceeded the total coverage.

---

[3] Courts around Kentucky frequently cite to this treatise when deciding matters of insurance law.  *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 78 n. 35 (Ky. 2010); *Wine v. Globe American Cas. Co.*, 917 S.W.2d 558, 562 (Ky. 1996); *Dyer v. Providian Auto & Home Ins. Co.*, 242 S.W.3d 654, 657 (Ky. Ct. App. 2007); *Andrus v. Preferred Risk Life Ins. Co.*, 777 S.W.2d 610, 613 (Ky. Ct. App. 1989).

With this background, the dispositive issue is as follows: to what extent is an insurer required to reimburse the insured for its expenses above the coverage amount to recoup covered property?  The Court has not encountered a Kentucky case interpreting the common law duty to mitigate an insurer's losses and therefore it will predict how the Kentucky Supreme Court would resolve this issue.  In *Jones v. Bituminous Cas. Corp.*, the state's highest court considered whether failure to provide prompt notice of a loss defeated insurance coverage.  821 S.W.2d at 801.  The court reviewed four major features under Kentucky insurance law to decide the issue: (1) insurance agreements were contracts of adhesion, (2) an insured's reasonable expectations of coverage, (3) whether coverage was statutorily mandated, and (4) if the insurer's avoidance of payment under the policy constituted a windfall.  *Id*. at 802-03.  The Sixth Circuit adopted an identical approach when it decided another unanswered question of Kentucky insurance law.  *See Old Republic*, 306 F. App'x at 254-55 (citing *Jones*, 821 S.W.2d at 802-03).  Though these two cases involve the issue of notice to an insured, the Court finds the factors cited in *Jones* persuasive and employs a similar methodology to answer the predicament before it.[4]

### 1. Contracts of adhesion

Standard form insurance policies are contracts of adhesion under Kentucky law.  If the contract has two constructions, "'the one most favorable to the insured must be adopted.  If the contract language is ambiguous, it must be liberally construed to resolve any doubts in favor of the insured.'"  *Jones*, 821 S.W.2d at 802 (quoting *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky. 1984)).  Where there are disparate levels of sophistication between the contracting parties, the court should read the terms and ambiguities against its drafter.  *Id*.  Here, the Policy and

---

[4] As coverage for theft by false pretenses is not mandated by state statute, this factor is immaterial to the analysis.

Endorsement were generic forms executed by the parties and there is no indication that UM possessed any leverage over Defendants in bargaining over their terms.

The Endorsement arguably contains an ambiguity insofar as it omits a term defining whether expenses to recover stolen property should be reimbursed to the insured. *See id.* ("Absent language in the contract clearly spelling out the meaning and parameters of [the term at issue], the reach of the term and the consequences are vague."). For the purposes of this opinion, the Court will construe the ambiguity against Defendants. The Court must be vigilant that in so doing it does not rewrite the contract to increase the overall risk to Defendants. *St. Paul Fire*, 870 S.W.2d at 227.

### 2. Doctrine of reasonable expectations

"An essential tool in deciding whether an insurance policy is ambiguous, and consequently should be interpreted in favor of the insured, is the so-called 'doctrine of reasonable expectations.'" *Simon v. Continental Insur. Co.*, 724 S.W.2d 210, 212 (Ky. 1987). "The gist of the doctrine is that the insured is entitled to all the coverage he may reasonably expect to be provided under the policy." *Woodson v. Manhattan Life Ins. Co. of N.Y.*, 743 S.W.2d 835, 839 (Ky. 1987) (citation omitted). "The reasonable expectations doctrine is based on the premise that policy language will be construed as laymen would understand it." *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003).

The lack of defining language for the Every Effort Clause and the absence of a passage addressing the reimbursement of the insured's expenses are ambiguities that will be resolved in UM's favor. UM asserts that it was reasonable to expect reimbursement for the efforts it undertook to track down and recover its merchandise. The Court agrees that UM could have

16

expected some reimbursement for its expenditures in light of the above-cited cases on the reciprocal duty of mitigation.  However, it was both unreasonable and illogical for UM to believe it would be reimbursed any sum greater than the total coverage provided by the Endorsement.

The Court believes the Kentucky Supreme Court would adopt the reciprocal duty of an insurer to repay expenses incurred by the insured to protect covered property.  Regardless of this conclusion, the decisions cited by UM that represent an insured's right to recover for its mitigation efforts share one uniting theme - reimbursement of the insured is proper only where the actions prevent or minimize the loss for which the insurer would be liable.  *See* Couch on Insurance § 178:10 (3d ed. 2011).  In *Slay Warehousing Co., Inc. v. Reliance Ins. Co.*, 471 F.2d 1364 (8th Cir. 1973), the Eighth Circuit reviewed an action where an insured sought to recover expenses it accumulated when it took reasonable steps to protect its inventory after a portion of a warehouse collapsed.  *Id*. at 1365.  The court interpreted the applicable Missouri law and read the contract's cooperation clause to entitle the insured to repayment.  *Id*. at 1367-68.  In so doing, it offered the following explanation:

> Protective acts may be to the direct or incidental benefit of the assured so as to prevent further loss to its own property - but it is patently clear that the primary reason for such a provision within the policy is for the company's protection against liability for greater loss.  Many insurers provide within property insurance policies that such protection must be afforded and it shall be presumed that the assured is acting at the insurance company's request.  Such a provision is missing here.  However, as indicated, the obligation of the insurer can also be implied by the terms of the cooperation clause which requires the assured to take such action.  Thus, we conclude that the obligation to pay the expenses of protecting the exposed property may arise from either the insurance agreement itself or an implied duty under the policy contract based upon general principles of law and equity.

*Id*. at 1368 (citations omitted).  This summery of the reciprocal duty to mitigate mirrors that

17

adopted by Couch on Insurance and other courts.  *See* Couch on Insurance § 178:10 (3d ed. 2011); *see also American Home Assur. Co. v. J. F. Shea Co., Inc.*, 445 F. Supp. 365 (D.D.C. 1978); *Witcher Const. Co. v. Saint Paul Fire & Marine Ins. Co.*, 550 N.W.2d 1 (Minn. Ct. App. 1996); *Travelers Indem. Co. v. Pollard Friendly Ford Co.*, 512 S.W.2d 375 (Tex. Civ. App. 1974).

UM's actions did not protect Defendants from a greater loss.  Indeed, Defendants have not benefitted from UM's recovery efforts, as only where the costs for the recovery efforts are less than the limit of insurance could UM's expenditures benefit Defendants.  Any other conclusion would lead to a ridiculous result whereby insureds could spend with impunity to salvage their own property without any regard for the insurer's potential liability.  It would also eviscerate the precedent described above that promotes the prevention of the loss for which the insurer would be liable.  While the Kentucky Supreme Court would likely adopt some protections for insureds that minimize damages to the insurer, it was unreasonable for UM to believe such coverage existed for expenses ten times the total amount of insurance coverage provided by the Endorsement.

UM's unreasonable expectations are further highlighted by other provisions of the Policy. UM purchased insurance protection for Marine Operators Legal Liability, Protection and Indemnity Coverage, and Commercial General Liability.  Under these provisions, the Policy covered expenses incurred by Defendants in litigation defending UM for pollution violations and other accidents.  DN 25-2 at 20-23, 122-129.  The Policy caps the total defense costs Defendants are obligated to pay.  In the event of pollution litigation, each payment allocated to legal defense reduces the Policy's limit of insurance by an equal amount.  *Id*. at 22.  The duty to defend or pay damages is extinguished when the Policy's coverage is exhausted.  *Id*.  The same is true for the

Marine Operator coverage.  *Id.* at 126 ("If the amount of damages and 'defense expense' exceeds the deductible amount we will subtract the deductible amount from the loss and pay the remaining damages and 'defense expenses' *up to the Limits of Insurance*." (emphasis added)). The Endorsement incorporates similar language, as the most it will pay an insured annually for a false-pretense loss is the annual aggregate limit of insurance.  DN 25-2 at 117.

When interpreting a contract, courts should refer to other provisions in the agreement for guidance on the parties' intent.  *See Robinson v. Ehrler*, 691 S.W.2d 200, 207 (Ky. 1985) (Kentucky courts look to similar terms in a policy to ascertain another term's meaning); 43 Am. Jur. 2d *Insurance* § 297 (2005) ("An insured's reasonable expectations are discerned from the language of the disputed policy provisions, *other provisions*, and relevant extrinsic evidence, with guidance from case law interpreting similar provisions." (emphasis added)).  This Court would be remiss to review the Endorsement in a vacuum, ignoring Defendants' attempts to limit its exposure in the Policy's other sections.

The reoccurring language in the Policy restricting Defendants' payments to the limit of insurance is instructive.  How could UM reasonably believe its expenses were covered up to ten times the limit of insurance in the Endorsement when the Policy's other passages explicitly restricted payments to the total amount of coverage?  These passages substantially undermine UM's belief that Defendants would reimburse $100,000 of expenses to comply with a $10,000 policy provision.  *Cf. Edwards v. Carlisle*, 179 S.W.3d 257, 260-61 (Ky. Ct. App. 2004) (coverage under insurance contract was properly denied where insured could not reasonably expect coverage for loss).

The law surrounding an insurer's duty to repay mitigation expenses and the analogous provision of the Policy highlight UM's unreasonable expectations.  UM could not have

19

reasonably believed that a portion of its premiums would cover expenses incurred above the Endorsement's limit of insurance.  While the insured may be entitled to reimbursement in making "every effort" to reclaim the stolen property, the claim is still subject to the $10,000 coverage limit.

### 3. Windfall to insurer

The final factor evaluates the possibility that the avoidance of payment by the insurer may constitute a windfall in light of the premiums the insured paid for coverage.  *Jones*, 821 S.W.2d at 802-03.  In *Jones*, the Kentucky Supreme Court required a showing of substantial prejudice for the insurer to deny coverage in cases of the insured's late notice.  *Id.*  "By requiring the insurer to show substantial prejudice, the rule prevents the insurer from gaining a windfall and merely requires it 'to take the risk it was paid to take rather than escape liability for coverage otherwise provided.'"  *Employers Reinsurance Corp. v. Mutual Ins. Co., Ltd.*, No. 3:05-CV-556-S, 2007 WL 2407272, at *4 (W.D. Ky. Aug. 20, 2007) (quoting *Jones*, 821 S.W.2d at 803).

After examining the Policy with the final *Jones* factor, the Court is further convinced the Kentucky Supreme Court would only permit insureds to recover expenses used to save covered property to the extent it benefitted the insured.  The Court's original scenario with the Endorsement and the $6,000 theft is illustrative.  To allow an insurer to avoid a covered loss without reimbursing the insured for any expenses would violate the principles of equity that underlie the reasons for mitigation.  It would also constitute a windfall for the insurer, in that the insurer could avoid payment on a covered peril by requiring action by the insured, without reimbursing expenses.

A windfall for the insurer is impossible where the insured's expenses exceed the total

coverage available under the policy.  Were UM to receive the relief for which it advocates, the Court's interpretation of the Endorsement would effectively rewrite the agreement and increase Defendants' overall risk.  Insurers have legitimate reasons to limit their exposure to an insured's losses from theft by false pretenses.[5]  Defendants attempted to insulate themselves from these risks by requiring insureds to purchase additional coverage under the Endorsement.  Whereas the common law duties expressed above may tack on additional obligations for mitigation efforts, neither the Policy nor Endorsement sought to hand out sums above the limit of insurance.  If the Court construed the Endorsement as UM desires, not only would Defendants be liable for the express coverage for false pretense theft, but also any reasonable expense accumulated by UM in its search for the property.  This would increase the risk to the insured tenfold, a result directly at odds with Kentucky precedent.  *See St. Paul Fire*, 870 S.W.2d at 227.

Defendants are not attempting to escape from liability that is otherwise provided for in the Endorsement.  The agreement between the parties is unambiguous that $10,000 is the limit of insurance, an amount that has already been tendered.  Rather, UM seeks to dramatically extend the Endorsement's coverage to include any and all expenses by an insured when it attempts to recover stolen property.  There is no indication that the premiums for the false pretense coverage were priced to include the possibility that insureds might recover in excess the Endorsement's limit of insurance.  Defendants have not garnered a windfall by refusing to pay the requested

---

[5] In *Insurance Co. of North America v. Lile*, 321 S.W.2d 50, 51 (Ky. 1959), the Kentucky Supreme Court held that unless the provisions within an insurance policy provided for false pretense coverage, a loss arising from the insured's entrustment of property to a thief should be born by the insured.  *Id.* at 51.  The court rationalized that under these circumstances, it was the "the insured who possesses superior opportunities for ascertaining the moral character and reputation of the one to whom possession is so given than does the insurer and that the consequences should fall' on him."  *Id.*

attorneys' fees.

### 4. Balancing of factors

The Kentucky Supreme Court would apply the common law rule permitting insureds to recover expenses when they attempt to mitigate losses to covered property. *See* Couch on Insurance § 178:10 (3d ed. 2011). Still, overlaying this duty atop the Endorsement is justified only inasmuch as it does not exceed the total coverage provided. To find otherwise would give credence to UM's unreasonable expectations, ignore similar sections of the Policy, and impermissibly rewrite the risk to Defendants. Moreover, UM's interpretation of the duty to mitigate would greatly expand the potential liability for all insurers who have similar clauses in insurance agreements requiring insureds to cooperate. "'[W]hen given a choice between an interpretation of state law which reasonably restricts liability, and one which greatly expands liability, [the district court] should choose the narrower and more reasonable path.'" *Aarti Hospitality, LLC v. City of Grove City, Ohio*, 350 F. App'x 1, 6 (6th Cir. 2009) (quoting *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004)). Kentucky courts would abide by the general rule that limits recovery of expenses so far as it protects the insured from suffering a greater loss.

With these conclusions, the Court returns to the factual narrative underlying this lawsuit. Defendants have already paid $10,000 to UM for the covered theft-by-false-pretense loss. Any expenses incurred by UM above this amount did not reduce Defendants' contractual obligations. Because these expenditures did not benefit Defendants by preventing or minimizing a covered loss, the payment of the Endorsement's limit of insurance satisfied their contractual duties. UM is not entitled to further reimbursement of its expenses.

### D. Miscellaneous arguments by UM

UM pursues several arguments within its motion that merit a brief discussion. It cites the

22

section of the Restatement (Second) of Contracts that outlines how a court can supply an essential term to a contract when the parties omit it. *See* Restatement (Second) of Contracts § 204, comment d (1981). According to the Restatement, where the parties fail to reach an agreement on a term, "the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process." *Id*. UM encourages the Court to predict that the Kentucky Supreme Court would adopt this provision from the Restatement of Contracts and then insert a favorable term.

Even if the Court were to adopt the Restatement and add language into the Endorsement, the term would track those provisions already present in the Policy that restrict Defendants' liability to the limit of insurance. This term would comport with the "community standards of fairness," because while it would allow an insured to recoup the reasonable costs of mitigation, payments would be limited to the extent they reduced an insurer's potential loss. Such a term would effectuate the policy of encouraging an insured to reduce the potential economic loss to the insurer while not unfairly rewriting the agreement.

Next, UM asserts that the Endorsement is unconscionable and asks the Court to void it. The Court declines to do so. "A fundamental rule of contract law holds that, absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001) (citing *Cline v. Allis-Chalmers Corp.*, 690 S.W.2d 764 (Ky. Ct. App. 1985)). The doctrine of unconscionability operates as an exception to this rule, "directed against one-sided, oppressive and unfairly surprising contracts." *Schnuerle v. Insight Communications Co.*, L.P., Nos. 2008-SC-000789-DG, 2009-SC-000390-DG, 2010 WL 5129850, at *10 (Ky. Dec. 16, 2010) (citation omitted)

23

The Policy and Endorsement are not unconscionable.  Appellate courts in Kentucky have reviewed and enforced insurance policies that differentiate between theft and theft by false pretenses.  *See Lile*, 321 S.W.2d at 50; *Frank Shoop, Inc. v. TIG Ins. Co.*, No. 2007-CA-000691-MR, 2009 WL 874535 (Ky. Ct. App. Apr. 3, 2009).  Furthermore, when the reasons for unconscionability are UM's unreasonable beliefs about reimbursement, the Endorsement is not unjust.  The Court cannot say the Policy and Endorsement were contracts that "no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other."  *Schnuerle*, 2010 WL 5129850, at *10 (citation and quotation marks omitted).

UM urges the Court to estop Defendants from denying liability for recovery costs.  UM claims it detrimentally relied on the adjuster's silence concerning whether legal expenses were covered by the Endorsement.  Kentucky law does not allow coverage by estoppel where the insured relies on behavior by the insurer's employees.  *See e.g.*, *Old Republic Ins. Co. v. Begley*, 314 S.W.2d 552, 557 (Ky. 1958); *Owens v. National Life & Accident Ins. Co.*, 234 Ky. 788, 29 S.W.2d 557 (Ky. 1930); *Kentucky Farm Bureau Ins. Co. v. Cann*, 590 S.W.2d 881, 883-84 (Ky. Ct. App. 1979).  Thus, these contentions must fail.

UM states the Endorsement violates public policy and petitions the Court to set the exclusion aside.  In support, UM offers conclusory language about the need for the insurance agreement to fully cover its expenses.

"If a contract 'has a direct tendency to, and would if upheld and enforced, injuriously affect a material and substantial part of the public, it will be declared to be one against public policy and most generally nonenforceable.'"  *Lewis by Lewis v. West Am. Ins. Co.*, 927 S.W.2d 829, 835 (Ky. 1996) (quoting *Forbes v. City of Ashland*, 55 S.W.2d 917, 919 (Ky. 1932)).

24

"Reasonable conditions, restrictions and limitations on insurance coverage are not deemed *per se* to be contrary to public policy."  *Snow v. West American Ins. Co.*,161 S.W.3d 338, 341 (Ky. Ct. App. 2004).  The Court rejects UM's assertions regarding public policy because there is no indication that any portion of Kentucky's population will be affected by this exclusion or that the exclusion of theft by false pretenses is an overbearing condition of the insurance agreement.

**CONCLUSION**

For the foregoing reasons, the Court hereby issues the following rulings:

(1)     Plaintiff's motion to amend (DN 24) is DENIED.  The Policy excludes coverage for theft losses from dishonest or criminal acts arising from the entrustment of property to anyone for any purpose.  Accordingly, the proposed amendment under Federal Rule of Civil Procedure 15 is futile.

(2)     Plaintiff's motion for summary judgment (DN 25) is DENIED and Defendants' motion for summary judgment (DN 20) is GRANTED.  Although the Kentucky Supreme Court would likely recognize the reciprocal common law duty to reimburse mitigation efforts by the insured, the language of the Policy and the law surrounding this duty restrict reimbursement to the extent it prevents or minimizes losses to the insurer.  As Defendants paid Plaintiff the Endorsement's total coverage limit, they have fulfilled their contractual obligations.

(3)     Judgment is entered for the Defendants and the Clerk of Court is directed to strike this matter from the active docket.

(4)     An appropriate order shall issue.